IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| McKENZIE JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.   24 C 3911 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff McKenzie Jones began working for Whole Foods in 2018 as a "Team Receiver"—someone who receives and prepares product and stocks the store.   Through his employment at Whole Foods, plaintiff obtained disability benefits under the "Whole Foods Market Group Benefit Plan" (the "Plan").   The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and is insured by defendant Unum Life Insurance Company of America.

In November 2022, plaintiff (then around 30 years old) stopped working because of back pain, which he has suffered from since a 2018 moving vehicle accident and which he says flared up after a busy time at work.   Plaintiff thereafter received short-term disability benefits, followed by a couple of weeks of long-term disability benefits.   But defendant ultimately terminated his long-term benefits effective June 8, 2023.

Plaintiff believes that defendant was wrong to do so.   So he filed his complaint in this court, asserting an ERISA claim under 29 U.S.C. § 1132(a)(1)(B)—ERISA's private right of action—"to recover benefits due to him under the terms of his plan."   Id.   He seeks a judgment that awards him long-term disability benefits from June 8, 2023, through May 23, 2025, and that

remands the matter to defendant to determine whether plaintiff is disabled from any gainful occupation.   Defendant contends that plaintiff failed to satisfy the Plan's terms for payment of benefits.   It therefore seeks a judgment in its favor.

The parties have cross-moved under Fed. R. Civ. P. 52(a).   In doing so, they have filed several briefs, a "Stipulation of Uncontested Facts," "Statements of Contested Facts," and the "record for the Court's review."   By moving under Rule 52, the parties have agreed to a "paper trial," "which allows the district court to resolve the dispute without a formal trial by making findings of fact and conclusions of law based on the administrative record."   Oye v. Hartford Life & Accident Ins. Co., 140 F.4th 833, 836 (7th Cir. 2025).   Based on the following findings of fact and conclusions of law, the court finds that plaintiff has not shown that he is entitled to benefits.   The court thus grants judgment for defendant.

## DISCUSSION

"The standard of judicial review in civil actions under 29 U.S.C. § 1132(a)(1)(B) depends upon the discretion granted to the plan administrator in the plan documents."   Semien v. Life Ins. Co. of N. Am., 436 F.3d 805, 810 (7th Cir. 2006).   To that end, "[a] district court conducts a de novo review of a denial of benefits under an ERISA plan unless the plan documents grant the claim fiduciary discretionary authority to construe the policy terms to decide eligibility for benefits."   Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan, 687 F.3d 320, 327 (7th Cir. 2012).   Both parties here agree that de novo review is the appropriate standard of review.   And in fact, defendant—who "[u]ltimately" has the "burden to establish that the language of the plan gives [it] discretionary authority to award benefits," Walsh v. Long Term Disability Coverage for All Emps. Located in the United States of DeVry, Inc., 601 F. Supp. 2d

1035, 1039 n.3 (N.D. Ill. 2009) (cleaned up)—affirmatively states that the "Plan does not confer [it] with [any such] discretion."

Consequently, "ERISA obligate[s]" this court "to review the administrative record and come to an independent decision on both the legal and factual issues that form the basis of the claim." Oye, 140 F.4th at 836 (cleaned up). That is because "a district court considering ERISA-based disability claims [de novo] owes no deference to the plan administrator's decision." Id. at 837. The term "review," then, is a bit of a misnomer: what the district court must do is not a "'review' of any kind; it is an independent *decision*, akin to a contract dispute." Dorris v. Unum Life Ins. Co. of Am., 949 F.3d 297, 304 (7th Cir. 2020) (cleaned up) (emphasis in original). Ultimately, "[t]his means the court must determine—based on all evidence in the record—whether [plaintiff] qualifies for longterm disability benefits under the terms of the Plan." Walsh, 601 F. Supp. 2d at 1040. In doing so, the "court can limit itself to deciding the case on the administrative record but should also freely allow the parties to introduce relevant extra-record evidence . . . ." Dorris, 949 F.3d at 304.

"As the applicant seeking benefits," plaintiff bears "the burden of proving entitlement to those benefits, and any gaps in the record cut against [his] claim." Oye, 140 F.4th at 837 (cleaned up). His burden is by a preponderance of the evidence. Daniliauskas v. Reliance Standard Life Ins. Co., No. 1:16-CV-9278, 2018 WL 1336051, at *3 (N.D. Ill. Mar. 14, 2018).

In reaching a decision, the court has "no legal obligation to discuss each piece of evidence in the record," to "make findings on all facts presented," "to conform [its] opinion[ ] to any particular template[,] or to produce decisions of any particular length." Oye, 140 F.4th at 838 (citations omitted). Indeed, "Rule 52(a) requires only that the district court 'find the facts

3

specially and state its conclusions of law separately.'" Id. (quoting Fed. R. Civ. P. 52(a)). In the end, what matters is that the court include "sufficient subsidiary facts so that [an appellate court] can clearly understand the steps by which [the court] reached its ultimate conclusion," and that the court's "ultimate decision is plausible in light of the record viewed in its entirety." Id. (cleaned up).

Turning to the particular issues here, in his opening brief, plaintiff argues that his "regular occupation" for purposes of establishing that he was "disabled" under the Plan—which defines "disabled" as, among other things, when the insured is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury"—is "stock clerk" as opposed to "custodian" or "janitor." He further contends that regardless of which occupation applies, he was disabled under the terms of the Plan because he cannot "stand/walk most of the workday, cannot lift 50 pounds on an occasional basis, and cannot remain awake throughout the workday."

In its opening brief, defendant first asserts that plaintiff failed to satisfy the Plan's requirement that he be under the "regular care of a physician" because "he had absolutely no medical treatment whatsoever for at least the next 9 months after May 31, 2023." Defendant also argues that plaintiff failed to establish that he was unable to perform his occupational duties.

Plaintiff responds, arguing that defendant's "regular care" argument fails because: "(1) [defendant]'s insurance policy does not require 'regular care' be continuous to receive benefits; (2) [defendant]'s withholding benefit payments caused Jones to be unable to afford continuous treatment; and (3) [defendant] never raised this as a basis to deny the claim during administrative

4

review."   Plaintiff then argues that defendant does not dispute that the relevant occupation was "store clerk," and he reiterates that he cannot work as either a stock clerk or custodian/janitor.

In reply, defendant argues that the court can decide whether plaintiff was under the "regular care of a physician" because the standard of review here is de novo.   Defendant also contends that the "totality of the medical evidence weighs against" plaintiff's disability claim.

The court finds that it can consider whether plaintiff was under the "regular care of a physician," and that based on the record as a whole, plaintiff has not shown that he was under the "regular care of a physician" after June 8, 2023.   As a result, the court grants judgment for defendant without reaching the issues of what the relevant occupation is and whether plaintiff could perform the pertinent occupational duties.

**FINDINGS OF FACT**

To the extent that these findings of fact are also deemed conclusions of law, they are incorporated into the court's conclusions of law.

In April 2018, plaintiff, who was around 25 years old at the time, was reportedly involved in a moving vehicle accident.   According to plaintiff, he has had some chronic lower back pain ever since.

On August 3, 2018, plaintiff began working for Whole Foods as a "Team Receiver" at 832 W. 63rd Street in Chicago, Illinois.   Whole Foods' job description for a "Team Receiver" states that "Responsibilities include, but are not limited to, receiving and preparing product and stocking the department."   And it lists the Physical Requirements for that job as including: "stand and walk for extended periods of time up to 4 hours without a break"; "lift loads

5

regularly, not to exceed 50 pounds, and occasionally beyond 75 pounds"; and "push and pull carts, weighing up to 100 pounds."

Plaintiff asserts that in September 2022, Whole Foods announced that plaintiff's store location would close to the public on November 13, 2022, and that plaintiff could transfer to another location. He further says that Whole Foods communicated that it could transfer plaintiff to another store as a "Sanitation Team Member," until it could place him elsewhere as a Team Receiver again.

According to Whole Foods, plaintiff became a "Sanitation Team Member" on November 14, 2022. Whole Foods' job description for a "Sanitation Team Member" states: "Performs all general maintenance duties for the store and reports to the Store Team Leader."

But plaintiff soon realized that he would not be able to continue. And by Thanksgiving Day, November 24, 2022, plaintiff had worked his last day at Whole Foods. According to plaintiff, he left work due to back pain. In particular, as plaintiff later reported in a physical therapy ("PT") evaluation, he had "some chronic back pain since [the] 2018" accident, "but [that] pain flared up in November 2022 around the time that he was very busy at work (Whole Foods), but no specific injury."

Whole Foods sponsors the Whole Foods Market Group Benefit Plan, which provides long-term disability insurance benefits to certain employees. The Plan is governed by ERISA, 29 U.S.C. § 1001 et seq, and is insured by defendant.

For full-time hourly team members, the Policy defines "Disabled" as:

You are disabled when [defendant] determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

6

- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when [defendant] determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

You must be under the regular care of a physician in order to be considered disabled.

The Plan defines "limited" as "what you cannot or are unable to do," and "Regular Occupation" as: "the occupation you are routinely performing when your disability begins. [Defendant] will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."   It further defines "material and substantial duties" as duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, [defendant] will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

The Plan further defines "regular care" as:

- you personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

The Plan also states that an employee must prove its claim by providing information showing, among other things, that plaintiff is under the regular care of a physician, the date the disability began, and the cause of the disability.   And it provides that payments will stop, for example, on the date that the employee is no longer disabled under the terms of the Plan.

7

The Plan also includes a 180-day elimination period—"a period of continuous disability which must be satisfied before you are eligible to receive benefits from" defendant. For plaintiff, this period was from November 25, 2022—the day after his last day at Whole Foods and which represents his "date of disability"—to May 23, 2023.

On December 2, 2022 (about a week after his last day at Whole Foods), plaintiff had a phone call with Sedgwick Claims Management Services, the short-term disability claim review fiduciary. Sometime thereafter, Sedgwick approved plaintiff's claim for short term disability benefits.

On December 6, 2022, plaintiff visited Victoria Viveen, PA-C, family medicine practitioner, where plaintiff reported a two-week history of back pain. Viveen diagnosed Jones with chronic bilateral low back pain without sciatica and morbid obesity. She referred plaintiff to PT and prescribed him Flexeril, a muscle relaxer and Ibuprofen (Advil, Motrin). That same day, Viveen completed a Certification of Health Care Provider for Team Member's Serious Health Condition. In it, she anticipated "the frequency of flare-ups and the duration of related incapacity" were 1 time per month for 1-2 days per episode.

On January 10, 2023, Viveen completed an attending physician statement. She wrote that plaintiff had "chronic bilateral low back pain." She estimated that plaintiff may resume work by January 18, 2023. Viveen also reported the treatment plan was pain medication and PT, and that no surgery had been performed or was anticipated.

On January 18, 2023, plaintiff had an office visit with Viveen, where he reported "severe back pain." The office visit notes state: "He was seen last month for this concern and recommended to return to work on today's date. FMLA was completed for patient at that time.

8

He was referred to [PT]; he has not scheduled his first appointment. Requests a new copy of his referral." Viveen noted that plaintiff was to "[c]all or return to clinic prn [as needed] if these symptoms worsen or fail to improve as anticipated."

That same day, Viveen completed an attending physician statement. She wrote that plaintiff has "severe midline lumbosacral back pain"; listed "morbid obesity" as a co-morbid condition; wrote that "patient [was] unable to work during severe pain, must seek medical care and recover at home"; and wrote that the treatment plan was PT and pain medication as needed, and that no surgery had been performed or was anticipated.

On January 26, 2023, plaintiff had his initial PT evaluation at United Rehab Providers with Khaled Gad, P.T., Ms. Gad's assessment states: "Based on the examination, the patient's rehabilitation potential to achieve functional goals is good." The recommendation was for plaintiff to "be seen for therapy as described at the following frequency and duration: 2 visits per week for 6 weeks. The timeframe to achieve functional goals was noted to be 8 weeks. Plaintiff reported his numeric pain rating at 8.

On February 2, 2023, plaintiff had another PT session with Gad. Gad documented that "[t]he patient feels that the exercises are the most helpful for reducing symptoms. [Plaintiff] reports that, overall his condition is improved as evidenced by his greater ability to sleep." Gad further noted "Pain - central low back; present; pain intensity is gradually decreasing" and "Pain -buttock/posterior thigh: present." Plaintiff reported his numeric pain rating at 7. And Gad again documented that "the patient's rehabilitation potential to achieve functional goals is good," and that "there is a good prognosis for achieving the patient's previously identified functional goals" in the timeframe of 8 weeks.

Plaintiff had further PT sessions with Gad on February 9 and 21, where he reported his numeric pain rating at 6 and 5, respectively. There are no records that plaintiff attended any therapy with United after February 21, 2023.

Roughly a month and a half later, on April 6, 2023, plaintiff had another office visit with Viveen, at which "subjective" is noted as "concerns including back pain." Plaintiff reported that "he completed a course of [PT] (unknown # of visits) and reports no improvement in his pain." He stated that "[PT] was a waste of my money" and he "would like to try a different [PT] location." Plaintiff reported continued lower back pain with sciatica that flares any time he stands for longer than 5 minutes. Viveen referred him to PT and neurosurgery, and continued his prescriptions for Ibuprofen and Flexeril.

On April 11, 2023, Viveen completed an Attending Physician Statement on plaintiff. She identified "the beginning and ending dates for the period of incapacity" as March 24, 2023, to June 1, 2023, and estimated that plaintiff may resume work by June 1, 2023, and "may need extension." She wrote that the treatment plan was PT, pain medication, and neurosurgery consultation, and that plaintiff "must be off work to complete PT and consult with neurosurgery."

On April 24, 2023, Jones had an initial PT evaluation at Schwab Rehabilitation Hospital with Maureen McFadden, PT, DPT. McFadden documented that listed impairments included decreased activity tolerance, poor body mechanics, impaired gait, pain, decreased postural control, decreased range of motion, and impaired strength. McFadden wrote that "Rehab Potential/Prognosis" was "good," and the plan was for plaintiff to attend "the skilled service of [PT] … 2 times per week for 6 weeks in order to increase the patient's function."

On May 4, 2023, plaintiff visited Viveen, reporting no change in his lower back pain. Viveen documented musculoskeletal "tenderness present," no edema in his legs, normal cardiovascular, normal pulmonary, and normal neurological findings. Viveen's assessment and plan was chronic bilateral low back pain without sciatica and dietary counseling and surveillance. Plaintiff was to continue PT, follow up after his consultation with neurosurgery, and "[c]all or return to clinic prn [as needed] if these symptoms worsen or fail to improve as anticipated."

The next day, plaintiff had an office visit with neurosurgeon Dr. Ankit Mehta. Mehta documented that plaintiff reported being unable to stand for more than 5 minutes without experiencing symptoms. Mehta's physical examination documented that plaintiff had full 5/5 strength in his arms and legs. Mehta did not test strength or range of motion in plaintiff's lumbar spine. Mehta further documented there was not yet any imaging of the lumbar spine, and recommended an MRI. Mehta diagnosed plaintiff with acute bilateral low back pain with bilateral sciatica, and advised him to return after obtaining the MRI and to perform PT. At that same visit, Mehta ordered lumbar spine x-rays, that resulted in an impression of "unremarkable lumbar spine examination." The x-rays documented that "vertebral body heights appear normal. Intervertebral spaces are within normal limits. Negative for significant degenerative changes," and that "Sacroiliac joints appear normal" and "Soft tissues appear within normal limits." There are no records of any subsequent office visits with Mehta.

Thereafter, plaintiff had a PT session with McFadden on May 9, 2023. There, he walked on a treadmill forward for 2 minutes and demonstrated poor tolerance, leaning forward and

experiencing back pain shooting in his legs, and walking backwards for 2 minutes, he had fair

tolerance and back pain only.

That same day, Viveen completed an Attending Physician Statement.   Viveen estimated

that plaintiff may resume work by July 1, 2023.   As for the treatment plan, she wrote: "Awaiting

spinal MRI results and functional capacity evaluation ["FCE"] results. These findings will direct

his care plan going forward."

At another session on May 11, 2023, with McFadden, plaintiff reported that he went to a

grocery store and still had trouble walking and started having back pain pretty quickly, but "he

had less pain shooting in his legs."   The plan was to "[c]ontinue skilled [PT] per plan of care 2

times per week with emphasis on core strength, lumbar extension, and prox LE strength to

improve standing and walking tolerance. Prone instability test."

On May 17, 2023, plaintiff had a follow-up telemedicine appointment with Viveen.

Viveen documented that "[p]atient calls clinic today to update FMLA paperwork, due tomorrow.

Patient has been undergoing evaluation of his acute/chronic lower back pain with both [PT] and

neurosurgery given patient's reported inability to stand/walk for greater than 5 mins."   Viveen

documented "Per physical therapist, she recommends a [FCE] to assess patient's ability to return

to work. Has next appointment tomorrow."   Viveen noted that "[p]atient missed his recent

appointment for the lumbar MRI due to illness, and is rescheduled for May 23rd. Will follow up

with neurosurgery following the MR."   Viveen noted: "will refer for [FCE] with his [PT]

office," encouraged him to keep his appointments for the lumbar MRI and follow up with

neurosurgery, and he was to "[c]all or return to clinic prn [as needed] if these symptoms worsen

or fail to improve as anticipated." There are no records of any visits with Viveen after May 17, 2023.

On May 18, 2023, plaintiff had another PT session with McFadden, where plaintiff reported "that his symptoms are overall a little better," that "[h]e has less frequent episodes of the shooting pain," but that "the back pain continues to limit his standing and walking tolerance." Plaintiff was noted to have improvements in walking tolerance, repeated extension in standing, repeated extension in lying, and quadruped to press-up position. The plan was: "Continue skilled [PT] per plan of care 2 times per week with emphasis on core strength, lumbar extension, and prox LE strength to improve standing and walking tolerance."

Plaintiff had further sessions with McFadden on May 23, 30, and 31, where he showed gradual improvement in walking tolerance—for example, walking on a treadmill at 2.5 mph for 4.25 minutes—and excellent standing/walking/exercise tolerance in aquatic setting. But plaintiff reported that low back pain persists with prolonged standing and walking.

On July 11, 2023, plaintiff had a phone call with defendant. Defendant asked if plaintiff had had an MRI in June 2023, and plaintiff responded that he had not, because insurance would not pay for it.

On July 12, 2023, defendant called Dr. Mehta's office, which informed defendant that Mehta "only saw [plaintiff] one time, in May 2023, no NOV [next office visit] on file." The office advised that "[n]othing was done at this appointment, [plaintiff] was told he needed to hav[e] imaging done but at this point there is nothing on the file," and further stated that Mehta "is not providing any RLs [restrictions and limitations]."

At some point, defendant also consulted Katrina Turner, M.D., who is board certified in internal medicine, and had her contact PA Viveen to discuss plaintiff's condition. Dr. Turner sent a letter to Viveen, dated July 12, 2023. In it, Turner states: "After review of the medical records that are available to me, it appears reasonable that [plaintiff] is not precluded from performing the occupational demands noted above on a sustained full-time basis as of 6/8/2023." Turner asked whether Viveen agreed, and requested a response.

On July 18, 2023, Viveen responded to Turner's letter, checking "No," she did not agree that plaintiff was able to perform the identified occupational demands. Viveen wrote: "I am still awaiting patient's completion of his PT capacity evaluation, and neurology recs."

On July 28, 2023, plaintiff had another phone call with defendant. Defendant asked plaintiff if he had gone back to PT since June 8, 2023, and he responded that he was in the process of going back to PT. He explained that he must pay for the PT up front because his health insurance ended, and he needs to get money to go back to PT. He stated that he could "not afford [PT] visits[ ] because each time its [$]90." He also stated that he would "contact Viveen when he has the money to do so."

In a letter dated that same day, defendant notified plaintiff that it had "approved your request for Long Term Disability benefits through June 7, 2023," but that it was "closing your claim as of June 8, 2023." Defendant paid benefits to plaintiff from May 24, 2023, through June 7, 2023, after satisfaction of the 180-day elimination period. Defendant advised plaintiff of his rights to an administrative appeal under ERISA and the Plan. The letter also noted that the "frequency of treatments, which include follow up visits greater than 30 days apart does not support the presence of severe symptoms," and that there was "no indication that [plaintiff] ha[d]

14

resumed [PT] or obtained recommended diagnostic testing as ordered in the May 05, 2023 office visit."   And in the section titled, "Policy Provisions," the letter stated that defendant "relied upon [the Plan] when making [its] decision, including provisions and exclusions listed below . . . ."   Among those provisions was the Plan's discussion of what constitutes "disabled," which included the statement that "[plaintiff] must be under the regular care of a physician in order to be considered disabled."

Roughly two and half months later, on October 9-10, 2023, plaintiff underwent a two-day FCE at Premier Physical Therapy.

On January 4, 2024, plaintiff timely appealed the July 28, 2023 benefit termination.   He submitted additional information with his appeal, including the FCE from October 9-10, 2023.

On March 4, 2024, plaintiff underwent an MRI of his lumbar spine. (AR 1231). The Impression from the MRI states:

1. L4-L5 mild canal stenosis. Mild to moderate left and mild right foraminal stenosis.
2. L5-S1 facet arthropathy without canal or foraminal stenosis.

On or around March 4 or 5, 2024, Viveen communicated to plaintiff that she had "received the MRI results and reviewed the report," and that they showed, among other things, "mild canal stenosis of L4-L5 vertebrae," which "means a slight narrowing of the spinal canal that can sometimes cause pain, numbness, or weakness of the legs."   She "recommend[ed] referrals to both neurosurgery and [PT]."   She noted that plaintiff had "received referrals to both of these specialists during our visit on 2/14/24."

On April 14, 2024, defendant called plaintiff's attorney to "inquire if they can verify any add'l treatment between 5/17/2023 and the date of the MRI 3/4/2024 from Victoria Viveen or

15

any other provider." Plaintiff's attorney "stated that there are no additional medical records from Victoria Viveen, PA or any other provider."

On April 26, 2024, defendant upheld on administrative appeal the determination to close plaintiff's claim effective June 8, 2023. In that letter, defendant explained that "[a]s of June 8, 2023, your client had completed 10 [PT] sessions and there was no evidence of referral to pain management or follow-up with any medical provider beyond completion of [PT]." The letter further noted that the "reviewing physician noted there is a lack of intensity of treatment consistent with an impairing condition."

The letter also noted: that plaintiff "attend[ed] several [PT] visits with benefit as of May 31, 2023"; that "[h]e had improved lumbar range of motion"; that he "was to continue to undergo [PT] through June 8, 2023; and that the "May 31, 2023[ ] [PT] note indicated that the plan was for [him] to continue skilled [PT] per plan of care 2 times per week." It further stated that "the MRI was performed approximately nine months after the date in question," and that there was a "lack of intensity of treatment consistent with an impairing condition"—"[w]hile [he] was referred to neurosurgery, he did not follow through with this referral until May 2023," and "was not treated by any other specialty other than [PT]." And in the section titled, "Policy Provisions that Apply to the Appeal Decision," the letter stated that defendant "relied upon [the Plan] when making [its] decision, including the provisions listed below . . . ." Among those provisions was the Plan's discussion of what constitutes "disabled," which included the statement that "[plaintiff] must be under the regular care of a physician in order to be considered disabled."

<u>**CONCLUSIONS OF LAW**</u>

To the extent that these conclusions of law are also deemed findings of fact, they are incorporated into the court's findings of fact.

### <u>Under the "Regular Care of a Physician"</u>

As discussed above, defendant argues that plaintiff failed to satisfy the Plan's requirement for disability that he be under the "regular care of a physician" because "he had absolutely no medical treatment whatsoever for at least the next 9 months after May 31, 2023." Plaintiff argues that defendant's "regular care" argument fails for three reasons: "(1) [defendant]'s insurance policy does not require 'regular care' be continuous to receive benefits; (2) [defendant]'s withholding benefit payments caused [plaintiff] to be unable to afford continuous treatment; and (3) [defendant] never raised this as a basis to deny the claim during administrative review."

### <u>Whether Defendant Can Rely on the "Regular Care" Provision</u>

Because plaintiff's last argument would dispose of defendant's "regular care" assertion if accepted, the court addresses it first. Plaintiff contends that defendant cannot rely on the "regular care" provision because defendant failed to raise that "term as a basis to deny the claim in the initial benefit denial." According to plaintiff, ERISA (29 U.S.C. § 1133) and its accompanying regulation (29 C.F.R. § 2560.503-1(g)(1)(ii)) required defendant to provide the specific reasons for its denial, and the Seventh Circuit has said that courts should not consider "*post hoc* attempt[s] to furnish a rationale for a denial of . . . benefits in order to avoid reversal on appeal." (Quoting <u>Halpin v. W.W. Grainger, Inc.</u>, 962 F.2d 685, 689 (7th Cir. 1992) (emphasis in original)).

In response, defendant argues that plaintiff is wrong because when, as here, the court is conducting a de novo review, it is not "prevented" "from applying the Plan's contract terms based on the ERISA administrative proceedings"—"what happened before the plan administrator is irrelevant in a de novo review case." (Quoting Dorris, 949 F.3d at 304).

In surreply, plaintiff argues that Dorris is off point. Indeed, plaintiff asserts, "there was no statutory and regulatory violation in Dorris, and no resulting prejudice," and the insured in "Dorris was on notice of the applicable definition of disability on which Unum based its decision because Unum cited it in the denial letter."

Defendant counters in its response to plaintiff's surreply that Dorris is relevant here because it "reaffirm[s] decades of legal precedent defining the parameters of ERISA *de novo* judicial review." And that precedent, defendant suggests, makes clear that the "district court's role [is] to make an independent decision about [claimant's] entitlement to benefits, and therefore any procedural foibles [administrator] may have made are irrelevant." (Quoting Marantz, 687 F.3d at 328). And in any event, defendant contends, "there was no regulatory violation": Defendant told plaintiff in its claim-determination letters that it "'relied upon [his] policy when making [its] decision, including provisions and exclusions listed below,' which includes the Plan's definition of disability and the requirement that '[he] must be under the regular care of a physician in order to be considered disabled.'" (Quoting AR689, AR1355).

The court agrees with defendant that the court may consider defendant's "regular care" contention. To be sure, plaintiff is correct that the relevant regulations required defendant to provide the specific reasons for denying disability benefits. Under 29 U.S.C. § 1133, the employee benefit plan shall:

18

     (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

     (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

And the accompanying regulation further states that "the plan administrator shall provide a claimant with . . . notification of any adverse benefit determination," which "shall set forth, in a manner calculated to be understood by the claimant:

     (i) The specific reason or reasons for the adverse determination; [and]

     (ii) Reference to the specific plan provisions on which the determination is based[.]"

29 C.F.R. § 2560.503-1(g)(1)(i) and (ii).

     But plaintiff's reliance on these regulations is unavailing. For starters, although defendant did not directly discuss the "regular care" issue in its decision letters, it did refer to the frequency of treatments in both letters. For example, the initial decision letter noted that plaintiff's "follow up visits [were] greater than 30 days apart," and that there was "no indication that [he] ha[d] resumed [PT] or obtained recommended diagnostic testing as ordered in the May 05, 2023 office visit." And the appeal decision letter noted that: "the MRI was performed approximately nine months after the date in question"; there was a "lack of intensity of treatment consistent with an impairing condition"; and "[w]hile [plaintiff] was referred to neurosurgery, he did not follow through with this referral until May 2023," and "was not treated by any other specialty other than [PT]." And in sections titled, "Policy Provisions" (in the initial letter) and "Policy Provisions that Apply to the Appeal Decision" (in the appeal letter), defendant stated that it "relied upon [the Plan] when making [its] decision, including [the] provision[ ]" that sets forth

what constitutes "disabled," which included the statement that "[plaintiff] must be under the regular care of a physician in order to be considered disabled." This, then, is not a situation where the insurer relies on an entirely separate exclusion provision that it had not relied on below. See Juszynski v. Life Ins. Co. of N. Am., No. 06 CV 5503, 2008 WL 877977, at *13-15 (N.D. Ill. Mar. 28, 2008) (finding that "LINA effectively waived" its ability to rely on a separate exclusion limitation for alcoholism "by failing to comply with the requirements of 29 U.S.C. § 1133" in raising it for the first time in litigation).

But even "[m]ore importantly," the Seventh Circuit has more recently made clear that courts can consider alleged "post hoc rationalizations" when, as here, the "district court's judicial review of [the insurers']'s decision is de novo." Marantz, 687 F.3d at 328. In Marantz, the plaintiff there (Marantz) argued that after litigation began, the insurer (LINA) relied on surveillance video showing Marantz performing everyday tasks to reject her assertion that she was disabled. By doing so, Marantz contended, LINA violated "what [Marantz] claim[ed] is ERISA's prohibition o[n] post-hoc rationalizations, citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1(g)(1)(i)," id.—the very same sources plaintiff relies on here. The Seventh Circuit was not convinced.

After noting that it was "far from clear that LINA violated ERISA by failing to mention the surveillance [video] in the letter denying [her] administrative appeal," the court explained that it would not matter anyway. Marantz, 687 F.3d at 328. That is because, the court noted, "[t]he 'de novo' review in this context . . . is different than de novo review as we ordinarily use the term in this court": "In an ERISA case, the district court must come to an independent decision on both the legal and factual issues that form the basis of the claim." Id. (cleaned up).

"In fact," the court continued, "the district courts are not reviewing anything; they are making an independent decision about the employee's entitlement to benefits." Id. (cleaned up). So "whether the plan administrator gave the employee a full and fair hearing"—as is expressly required under 29 U.S.C. § 1133(2)—"or undertook a selective review of the evidence is irrelevant": "Under de novo review . . ., the surveillance video would be proper evidence in the district court even if LINA had violated ERISA by failing to note the video in its decision letters." Id. Put simply, the court concluded: "The district court's role was to make an independent decision about [Marantz]'s entitlement to benefits, and therefore any procedural foibles LINA may have made are irrelevant on appeal." Id.

Here, as in Marantz, it is not "clear that [defendant] violated ERISA," but in any event, the court is conducting a de novo review, and so "any procedural foibles [defendant] may have made are irrelevant." Id. As in Marantz, then, "even if [defendant] had violated ERISA by failing to" raise the regular-care issue "in its decision letters," it would not prevent the court from considering whether plaintiff meets the regular care requirement for being disabled. Id.

Plaintiff's reliance on Halpin is misplaced. True, Halpin stated that a "post hoc attempt to furnish a rationale for a denial of benefits in order to avoid reversal on appeal, and thus meaningful review[,] is not acceptable." 962 F.2d at 696. But it did so under a deferential "arbitrary and capricious" standard—not a de novo standard. Id. at 688; see also Reich v. Ladish Co. Inc., 306 F.3d 519, 522, 524 n.1 (7th Cir. 2002) (explaining in case under the arbitrary and capricious review standard that "Ladish was required to give Reich every reason for its denial of benefits at the time of the denial" and could "not add new reasons as the litigation proceeds"). "The rationale for the post-hoc rule" in a deferential arbitrary-and-capricious

21

review "is that the court cannot defer to a plan interpretation that was not offered in the administrative process." Martinez-Claib, M.D. v. Bus. Men's Assur. Co. of Am., 349 F. App'x 522, 524 (11th Cir. 2009). "Such a concern," however, "is not present where [a court is] asked to review the denial of benefits de novo." Id. Thus, plaintiff's deferential-review case law is inapposite here.

Nor is the court persuaded by plaintiff's suggestion that he has been prejudiced by defendant's post-hoc rationale. Plaintiff submits that, had defendant raised the "regular care" issue in denying his claim, he "would have known he need[ed] to get continuing treatment to perfect his claim" and to collect benefits. But the court agrees with defendant that "[m]edical treatment is not a pretext for [plaintiff] to achieve secondary gain through payment of employee benefits or a hurdle erected to preclude payment of benefits that [plaintiff] must 'perfect.'" The court finds that plaintiff has not been prejudiced by any alleged post-hoc rationale.

In short, the court will not bar defendant's "regular care" argument in this de novo review.

### Whether Plaintiff Met the "Regular Care" Provision

The Plan states that plaintiff "must be under the regular care of a physician in order to be considered disabled." (Emphasis added). The Plan then defines "regular care" as:

- you personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and
- you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

22

Defendant contends that plaintiff "cannot satisfy his burden of proving that after June 7, 2023, he was disabled and under 'regular care,'" because for the 9 months after May 31, 2023, plaintiff received no medical care, and "[n]o medical care cannot be 'regular care' or 'appropriate treatment and care.'" Indeed, defendant suggests that "regular care" means "continuity of care," citing on <u>Slaughter v. Hartford Life & Accident Insurance Co.</u>, No. 22-cv-5787, 2024 WL 3251371, at *10-11 (N.D. Ill. July 1, 2024). Defendant further asserts that plaintiff: "failed to follow the recommendations of his treatment providers for 'appropriate treatment and care' to effectively manage and treat his alleged disabling back condition"; failed to continue "[PT], despite his documented improvement when attending"; "failed to follow neurosurgeon Dr. Mehta's recommendation for an MRI in May 2023 to assess and manage his condition"; "failed to follow PA Viveen's recommendation in May 2023 to have the lumbar MRI and follow up with neurosurgery"; and "failed to follow PA Viveen's recommendation on May 17, 2023 to call or return to see her if his 'symptoms worsen or fail to improve as anticipated.'" Defendant therefore concludes that plaintiff "failed to satisfy the Plan's requirements for payment of disability benefits."

In response, plaintiff first argues that defendant's "regular care" argument is without merit because "there is no dispute [that plaintiff] received regular care of a physician up to June 7, 2023," and the Plan "does not require 'regular care' be continuous to receive benefits." According to plaintiff, defendant "could have easily included . . . a temporal requirement in the 'When Will Payments Stop?' section of the policy, but did not do so." And in fact, plaintiff says, "another policy provision contains a temporal requirement in that 'Disability must begin while you are covered under the plan.'" Plaintiff further contends that defendant's reliance on

23

Slaughter and its "continuity of care" requirement is "misplaced because that insurer's policies [there] expressly require[d] regular care of a physician be continuous by stating [that] benefit payments stop when the claimant is no longer under the regular care of a physician." Plaintiff argues that this case is instead closer to Berg v. N.Y. Life Ins. Co., 831 F.3d 426 (7th Cir. 2016), which, plaintiff asserts, held that a gap in treatment cannot be a basis to deny a claim.

Plaintiff also contends that defendant's "regular care" argument falls short because defendant's "withholding benefit payments caused [him] to be unable to afford continuous treatment." "The reason [that he] could not get an MRI or continued physical therapy after June 7, 2023," he says, was because defendant "did not pay [him], causing him to have no money to pay for the treatment." Defendant, he goes on, "cannot now rely on non-occurrence of that treatment as a basis to avoid its performance under the contract." If the court were to find otherwise, plaintiff posits, it would "incentivize insurers to delay and deny more claims to create an additional defense of a claimant not getting continuous treatment following the delay or denial."

In reply, defendant counters plaintiff's policy argument, asserting that the "regular care" clause is to "protect[ ] an insurance company from a claimant who refuses to see an appropriate doctor in fear that doctor may not give the claimant a diagnosis or prognosis he wanted." (Citations omitted). Defendant further contends that "[t]here is no requirement that the Plan pre-emptively pay disability benefits to fund medical care." Nor, it says, is an "under the regular care and attendance of a physician" clause "intended to allow the insurer to scrutinize, determine, and direct the method of treatment the claimant receives." (Quoting Heller v. Equitable Life Assurance Soc'y, 833 F.2d 1253, 1257 (7th Cir. 1987)). Defendant further

24

argues that plaintiff's "continuous" argument is a red herring because, under the Plan, "benefit payments stop on 'the date you are no longer disabled under the terms of the plan.'" (Quoting the Plan). And Berg is distinguishable because the policy there "defined sickness and injury as 'one which requires and receives regular care by a Physician,' which the Seventh Circuit explained "indicates that the requirement applies to the *kind* of malady that qualifies as an 'injury or sickness' under the policy, not *when* it qualifies." (Quoting Berg, 831 F.3d at 430 (emphasis in original)).

The court finds that plaintiff has not shown that he was under the "regular care of a physician" as is required under the Plan. The Seventh Circuit has explained that the similar "clause 'under the regular care and attendance' means just what it says, namely, that the insured is obligated to periodically consult and be examined by his or her treating physician at intervals to be determined by the physician." Heller, 833 F.2d at 1257. The clause "was not intended to allow the insurer to scrutinize, determine, and direct the method of treatment the claimant receives." Id. "Regular care" clauses instead serve at least two other purposes: (1) "to determine that the claimant is actually disabled, . . . is not malingering, and to prevent fraudulent claims," id. (citation omitted); and (2) to "minimize the insurer's loss under the policy in cases in which the insured's disability can benefit from a physician's care," Bakal v. Paul Revere Life Ins. Co., 576 F. Supp. 2d 889, 901 (N.D. Ill. 2008) (cleaned up).

Courts considering the phrase "regular care" after Heller have further explained that "[a]lthough 'regular care' does not require monthly visits with accompanying monthly reports," it does require evidence of "some form of continuity in the insured's treatment by physicians." Slaughter, 2024 WL 3251371, at *10 (citation omitted); Bakal, 576 F. Supp. 2d at 901 (citation

25

omitted).   The clause here demands even more than just "some form of continuity."   Again, it requires that the insured "visit[ ] a physician as frequently as is medically required . . . to effectively manage and treat [his] disabling condition," and that the insured "receiv[e] the most appropriate treatment and care."

Considering the record as a whole, the court finds that plaintiff failed to establish that he received sufficient "continuity of care" to "effectively manage and treat [his] disabling condition," or that he was "receiving the most appropriate treatment and care" after June 7, 2023. The record shows that:

- On December 6, 2022, plaintiff first saw PA-C Viveen, where she referred him to PT for treatment.

- On January 18, 2023, plaintiff met with Viveen and reported that he had not started PT.

- On January 26, he began PT with United Rehab, where he reported a pain rating of 8.

- He continued PT through February, and by February 21, his pain rating was down to a 5.   But he did not continue to see United Rehab.

- On April 6, he met again with Viveen, where he reported that he had no improvement from PT.   She again referred him to PT, and to neurosurgery.

- On April 24, he began PT with Schwab, which said he had a good prognosis.

- Two weeks later, he met again with Viveen, who told him to continue PT and to follow up after neurosurgery.

- On May 5, he visited with a neurosurgeon, Dr. Mehta, who recommended that plaintiff get an MRI.   There are no records of any further visits with Mehta.

- On May 9, Viveen wrote that she was "[a]waiting spinal MRI results and [FCE] results" and that "[t]hese findings will direct his care plan going forward."

- On May 17, plaintiff had a telemedicine follow-up with Viveen, where Viveen noted that he had "missed his recent appointment for the lumbar MRI due to illness, and [was] rescheduled for May 23rd," and "[would] follow up with neurosurgery following the MR."   She further noted that she would "refer for [FCE] with his [PT] office," that she encouraged him to keep his appointments for the lumbar MRI and to follow up with neurosurgery, and that she instructed him

to "[c]all or return to clinic prn [as needed] if these symptoms worsen or fail to improve as anticipated." There are no records of any further visits with Viveen.

- On May 31, plaintiff had his last PT session.
- On July 11, plaintiff reported to defendant that he did not have the MRI.
- A week later, Viveen reported to defendant's physician consultant that she was still "awaiting [plaintiff]'s completion of his PT capacity evaluation, and neurology recs."
- On October 9-10, plaintiff underwent a two-day FCE.
- Viveen suggests that she had a "visit" with plaintiff on February 14, 2024, where she again gave him referrals to neurosurgery and PT.
- On March 4, 2024, plaintiff underwent an MRI of his lumbar spine.

The facts show that plaintiff did not follow through with treatment from when he first met with Viveen in December 2022 to when he essentially stopped receiving any treatment for eight or nine months after May 31, 2023.[1] Indeed, he quit the first stint of PT (with United Rehab), despite his documented improvement in pain level from an 8 to a 5. He then waited over a month to see Viveen again, where he told her that PT was not working—again, despite PT records indicating that his pain level was improving. He then failed to follow Dr. Mehta's recommendation to get an MRI in May 2023 to assess and manage his condition. He similarly failed to follow Viveen's recommendation in May 2023 to complete the lumbar MRI and follow up with Dr. Mehta. More importantly, he also failed to follow Viveen's recommendation on May 17, 2023, to call or return to see her if his "symptoms worsen or fail to improve as anticipated." See Bakal, 576 F. Supp. 2d at 901 (finding that the plaintiff Bakal failed to satisfy a "regular and personal care of a physician" requirement for period in which he "did not return to [his doctor] for further care at the interval [his doctor] prescribed (i.e., 'if he continued to have

---

[1] Defendant does not argue that Viveen fails to meet the Plan's definition of "physician."

problems').").   And although defendant got the FCE in October 2023, he failed to get any form

of treatment from May 31, 2023, to at least February 14, 2024—a roughly nine-month total

cessation of care.   The undisputed evidence thus shows that plaintiff was not receiving regular

care here as was required.

Plaintiff's reliance on Berg misses the mark.   Indeed, the "regular care" requirement at

issue there differed in material respects from the one here: it placed requirements on what kinds

of maladies would qualify for disability benefit—not on what the insured needed to do to be

considered disabled.   The plaintiff there (Berg) started to experience a tremor in 2005.   Berg,

831 F.3d at 428.   By September 2007, the tremor forced him to leave his job.   Id.   So he sought

"total disability" benefits starting from September 2007.   Id.   But the insurers argued that he did

not meet his policy's definition of "total disability" until he saw a physician—which occurred on

February 3, 2010—because the term "total disability" had to "be an injury or a sickness" which

"requires and receives regular care by a Physician."   Id. at 429.   The Seventh Circuit disagreed.

In doing so, the court explained that the phrase "'[t]he injury or sickness must be one

which requires and receives regular care by a Physician' indicates that the requirement applies to

the *kind* of malady that qualifies as an 'injury or sickness' under the policy, not *when* it

qualifies."   Id. at 430 (emphasis in original).   In other words, the court continued, the provision

describes "the *class* of conditions that qualify under the policy—not a prerequisite for their onset

date."   Id. (emphasis in original).   So what mattered under the requirement there was not

whether the insured actually saw a physician; it was whether the insured's "injury or sickness"

was the "kind" that "requires and receives regular care."   Id.

That is not what matters here: The "regular care" provision here, unlike the one in Berg, places a requirement on the insured—not on the malady—stating that: "You [i.e., the insured] must be under the regular care of a physician in order to be considered disabled." (Emphasis added). And as explained above, that means that the insured receive sufficient "continuity of care" to "effectively manage and treat [his] disabling condition," and that he "receiv[e] the most appropriate treatment and care." It thus placed an ongoing requirement on plaintiff—one which he failed to show that he satisfied. Berg therefore does not help plaintiff here.

Nor does plaintiff's appeal to his alleged inability to pay for treatment. Plaintiff cites Stinnett v. Northwestern Mut. Life Ins. Co., 101 F. Supp. 2d 720 (S.D. Ind. 2000), for the notion that an insured is "excused from receiving ongoing care if he is no longer able to pay for it." But plaintiff reads too much into Stinnett. After explaining that "[a]s a general rule, provisions in policies of disability insurance requiring that the insured be under the care of a licensed physician during the period of disability in order to receive benefits are enforceable," the court noted that the plaintiff there had cited cases in which such provisions had not been enforced. Stinnett, 101 F. Supp. 2d at 723. The court then noted that in at least one of those cases— Sullivan v. North Am. Acc. Ins. Co., 150 A.2d 467 (D.C. 1959)—a court had found that there were "'more than adequate grounds to excuse [the] failure to submit to regular attendance and treatment by a doctor' where the insured was no longer able to pay expense of medical care." Stinnett, 101 F. Supp. 2d at 724 (quoting Sullivan, 150 A.2d at 472). Yet the Stinnett court found that in the case before it there was no "evidence that [Stinnett] simply could not avail himself of such care either because of financial constraints or the unavailability of any

29

physicians." Id. at 725. Bottom line: the court did not hold that in the ERISA context, insureds can avoid a "regular care" provision based on financial hardship.

And in fact, other cases have questioned whether financial hardship can excuse the regular-care requirement in the ERISA context. See Williams v. Delta Fam.-Care Disability & Survivorship Plan, No. 07-CV-5329CPS, 2009 WL 57138, at *12, nn. 11 & 12 (E.D.N.Y. Jan. 7, 2009) (distinguishing cases in the Social Security context that looked to financial hardship and distinguishing Sullivan—the case that Stinnett cited—explaining that "because the Sullivan case was decided 15 years prior to the enactment of ERISA, it is not binding on an ERISA claim"); see also Oxford v. Anthem Life Ins. Co., No. 1:11-CV-00507-TWP, 2012 WL 4390254, at *14 (S.D. Ind. Sept. 25, 2012) ("The Court . . . cannot find any reported cases that discuss the relevancy of financial hardship in the ERISA context.").

Plaintiff has not convinced the court that financial hardship can excuse a "regular care" requirement in an ERISA context. But even if the court were to find that financial hardship could excuse that requirement, the court finds that plaintiff has not established that a financial hardship in fact prevented him from obtaining regular care.

To be sure, there is evidence that plaintiff told defendant in July 2023 that he did not get an MRI in June 2023 because (health) insurance would not pay for it, that he would "contact Viveen when he has the money to do so," and that he could "not afford [PT] visits[ ] because each time its [$]90." But it appears that plaintiff could have gotten an MRI while he was still receiving health insurance and disability benefits in May and early June, but he at least twice declined to do so, missing the first scheduled MRI due to alleged "illness" and (apparently) missing a second "rescheduled [MRI] for May 23" for unknown reasons. And plaintiff provides

no direct evidence of his financial condition or of what returning to see Viveen would have cost. See Dorris, 949 F.3d at 304 (explaining that "any gaps in the record cut against [a plaintiffs'] claim," but that plaintiffs are permitted to "patch" any such gaps). Nor has he explained that he was unable to go to other clinics that offered PT and other relevant health services "at minimal or no costs to uninsured and underserved patients." Oxford, 2012 WL 4390254, at *15 ("Although Ms. Oxford may not have been able to continue treatment with her regular caregivers, there are clinics that offer both physical and psychotherapy at minimal or no costs to uninsured and underserved patients."). The court thus finds that plaintiff has not shown that his alleged financial hardships prevented him from receiving "regular care."

In sum, the court finds that plaintiff has not shown that he was under the "regular care of a physician" as is required under the Plan. The court therefore finds that plaintiff has not shown that he was entitled to benefits under the Plan after June 8, 2023.

## CONCLUSION

For the above reasons, the court grants defendant Unum Life Insurance Company of America's motion for judgment [40], and denies plaintiff McKenzie Jones's motion for judgment [38]. Defendant is directed to submit a proposed final judgment order by January 30, 2026.

So ordered.

**ENTER:**

Robert W. Gettleman
**United States District Judge**

**DATE:** **January 13, 2026**